IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFERY BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:12-cv-1013-WC |
| | ) | |
| SIKORSKY AIRCRAFT | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

On November 19, 2012, Plaintiff Jeffery Baker filed a three-count Complaint against Defendant Sikorsky Aircraft Corporation, alleging:    (Count I) "race discrimination" in violation of Title VII of Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; (Count II) "retaliation discrimination" in violation of Title VII of Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; and (Count III) "disability discrimination" in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12112, et seq.  Jurisdiction is proper under 28 U.S.C. § 1331 (federal question).  Both parties have consented to the conduct of all proceedings and entry of a final judgment by the undersigned United States Magistrate Judge.  (Doc. 30).

Before the court is Defendant Sikorsky Aircraft Corporation's ("Defendant") Motion for Summary Judgment (Doc. 33) and Memorandum of Law in Support (Doc. 34).  Plaintiff Jeffery Baker ("Plaintiff") filed a Response (Doc. 39), and Defendant filed

a Reply (Doc. 40).  Defendant has also filed a Statement of Undisputed Material Facts (Doc. 35) and a Response (Doc. 41) to the section of Plaintiff's Response titled "Additional Disputed Facts."  Upon joint request of the parties (Doc. 43), the court stayed this case pending the court's resolution of the Motion for Summary Judgment.  Order (Doc. 44).

Upon consideration of the Motion for Summary Judgment (Doc. 33), the pleadings of the parties, and the evidentiary materials filed in support thereof, and for the reasons that follow, the court finds that the Motion is due to be granted.

## II.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).[1]  Only disputes about material facts will preclude the granting of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the

---

[1] On December 1, 2010, amendments to Rule 56 became effective.  The amendments to Rule 56 generally reorganize the provisions of the Rule and incorporate language which is "intended to improve the procedures for presenting and deciding summary judgment-motions and [is] . . . *not intended to change the summary-judgment standard or burdens.*" *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 782 n.4 (1st Cir. 2011) (internal quotations omitted) (emphasis in original).  Moreover, because the summary judgment standard remains the same, the amendments "will not affect continuing development of the decisional law construing and applying" the standard now articulated in Rule 56(a).  Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendments.  Accordingly, while the Court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to cite to decisional law construing and applying prior versions of the Rule.

outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion[,]" and alerting the court to portions of the record which support the motion. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is then similarly required to cite to portions of the record which show the existence of a material factual dispute. *Id.* at 324. In doing so, and to avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## III.  STATEMENT OF FACTS

The court has carefully considered the pleadings in this case and all documents submitted in support of, and in opposition to, the Motion for Summary Judgment. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:[2]

Defendant operates a production facility in Troy, Alabama which primarily manufactures major helicopter components and structures. In 2006, the Troy Facility was retasked to manufacture certain helicopters for military use, which caused the Troy Facility to nearly double its hourly workforce to meet the new tasks and production goals. In order to meet its staffing needs, Defendant partnered with the State of Alabama, working with the Alabama Industrial Development Training ("AIDT") program.

---

[2] There is no section of disputed facts in Defendant's brief. Plaintiff filed his own disputed facts section as part of his response and then Defendant responded to Plaintiff's "disputed facts." The court has established this fact section by combining the relevant undisputed and "disputed facts" and making determinations where necessary.

The manufacturing work at the Troy Facility involved assembling thousands of sheet metal and machined metal parts, utilizing a variety of highly specialized aircraft fasteners to produce a complete helicopter airframe, requiring employees to have precise assembly skills and the ability to interpret and understand very detailed assembly instructions and blue prints.  In 2007, the manufacturing work at the Troy Facility was performed by, among others, Senior Aircraft Processors, Grade 22.

Senior Aircraft Processors were required to assemble, disassemble, repair, modify and restore aircraft parts and components.  The job description also stated that Senior Aircraft Processors would be responsible for "general housekeeping and safety and other continuous improvement activities," and that such employees would be responsible for "segregat[ing] waste material and follow[ing] good housekeeping practices" as required. All Senior Aircraft Processors have clean-up duties associated with their duties.

Defendant entered into a Collective Bargaining Agreement (the "CBA") effective October 16, 2006, with the International Brotherhood of Teamsters, Local 1150 (the "Union").  Permanent hourly employees at the Troy Facility, including all Senior Aircraft Processors, are represented by the Union.  However, the CBA also provides for a ninety-day probationary period before a new employee becomes a permanent Sikorsky employee and a member of the Union.  During this ninety-day probationary period, probationary employees have no seniority rights under the CBA.  The CBA also provides that Defendant has exclusive discretion on whether to retain an employee beyond his or her probationary period.  It is not uncommon for Defendant to terminate probationary employees during the ninety-day period.  In 2007, there were twenty nine employees

whose employment ended during the ninety-day probationary period.  Out of these twenty nine employees, twenty three were Caucasian and six were African American.

Generally, probationary employees are evaluated after thirty, sixty, and eighty days of employment with respect to their productivity, quality of work, safety, attendance, initiative, and working with others.  The Shift Supervisors are typically assigned the task of completing the evaluations of Senior Aircraft Processors.  The graded categories in performance reviews are rated on a scale of "1" to "5," with "5" being the highest score possible and "1" the lowest.  Defendant expects supervisors to obtain input from other supervisors and to utilize other tools when assessing employee performance.

In February 2007, Plaintiff (an African American male) was offered a Senior Aircraft Processor position at Defendant's Troy facility.  Plaintiff commenced his AIDT training program at the Troy Facility after he received his offer letter.  Approximately forty six people, both African American and Caucasian, were in Plaintiff's AIDT class. Plaintiff passed the AIDT training course.  Plaintiff began his employment as a Senior Aircraft Processor on March 21, 2007, at which time Plaintiff's ninety-day probation period began.  Defendant assigned Plaintiff to the tail cone unit.  Plaintiff claims that from March 21 to April 26, 2007, rather than working on the helicopter, Plaintiff was assigned to clean bathrooms and employee work stations, perform maintenance work, and performed "gopher" duties.

Because Defendant is a government contractor, it must keep an accurate calculation of employees' tasks each day (also known as "labor charging").  Senior

6

Aircraft Processors swipe badges that track each task that they are assigned on a given day. The badge-swipes record the labor charge code that Senior Aircraft Processors input for their tasks, which is then reflected on work order documents for each employee. Plaintiff possessed such a badge, and swiped it in accordance with the tasks he was assigned each day. The "new employee training" nomenclature is a labor charge code that new employees use while they are receiving on-the-job training. There are also labor charge codes associated with maintenance. It is an employee's responsibility to know which tasks they have been assigned and what labor charge codes they should utilize. Supervisors or lead employees will inform Senior Aircraft Processors which tasks they will be assigned for the day, and employees will input the appropriate labor charge code for such tasks. Although Plaintiff claims he was assigned to clean bathrooms from March 21 to April 26, 2007, Plaintiff swiped primarily "new employee training" labor code charge entries. Plaintiff also swiped an entry called shop floor meetings, which entailed physical fitness and daily briefings among employees in his group and supervisors.

From April 26, 2007 moving forward, Plaintiff was working on tail cone assignments, including laying holes, drilling holes, and affixing fasteners. On May 21, 2007 (sixty days after Plaintiff began working), Plaintiff received his thirty-day review from Supervisor Randall Hattaway. Hattaway gave Plaintiff a "2" rating for productivity, and "3" ratings in all other categories. Plaintiff believes he should have received "4" and "5" ratings because he worked every day for ninety days, was never late, worked early and late, showed initiative, and demonstrated that he worked well with others. Plaintiff

does not believe the review covered the type of maintenance work that he performed, but Plaintiff did not address his complaints with Hattaway.  Plaintiff also received his sixty-day review from Hattaway on May 21, 2007.  Hattaway gave Plaintiff a "3" rating in all categories.  Hattaway provided Plaintiff with the same feedback that he gave for Plaintiff's thirty-day performance evaluation.  Plaintiff believes he should have received a higher rating.  Hattaway obtained input from other employees regarding Plaintiff's performance.

Plaintiff's complaint alleges that, at some point during Plaintiff's employment, he asked a supervisor about Sikorsky's "policy and practice . . . toward blacks in management positions."  Plaintiff was still on probation at the time of these conversations, and probationary employees are not eligible for supervisory or management positions.

On June 15, 2007, Shift Supervisor Danny Sleasman gave Plaintiff his eighty-day review.  It was not uncommon for a different supervisor to complete eighty-day evaluations for employees as compared to the previous evaluators.  Plaintiff received "1" ratings in productivity and quality, and a "2" rating in initiative.  The review noted that Plaintiff's "productivity, quality, and initiative had suffered since last reviewed."  Sleasman asked Plaintiff to sign the evaluation, which Plaintiff refused after reviewing its contents.

On or about June 18, 2007, while Plaintiff was still a probationary employee, Roy B. Wood, who has worked as a manufacturing manager at the Troy Facility since late 2006 or early 2007, made the decision to terminate Plaintiff's employment for poor

performance.  Out of the forty six people in Plaintiff's AIDT class, four were terminated for failure to meet expectations during their probationary periods:  Darnell Williams (African American), Plaintiff, David Evon (Caucasian), and Maurice Ward (Caucasian).

## IV.   DISCUSSION

### A.   *Wrongful Termination based on Racial Discrimination (Count I)*

In Count I of the Complaint, Plaintiff alleges that his employment was terminated because of his race, in violation of Title VII.  Racial discrimination claims require a *prima facie* showing of discriminatory intent, *E.E.O.C. v. Joe's Stone Crab*, 220 F.3d 1263, 1286 (11th Cir. 2000), which "can be established three ways: 1) direct evidence; 2) circumstantial evidence; or 3) statistical proof."  *Davis v. City of Panama City, Fla.*, 510 F. Supp. 2d 671, 681 (N.D. Fla. 2007) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).   Plaintiff has not provided direct evidence that discrimination was the reason for any alleged adverse employment action nor has he proffered statistical evidence or evidence of a pattern of discrimination in this case. Because Plaintiff's discrimination claim relies on circumstantial evidence, the claim is analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

### 1.   Establishing a *Prima Facie* Case

Under the *McDonnell Douglas* framework, Plaintiff must first create a presumption of discrimination by establishing a *prima facie* case.  *Id.*  "[T]he plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally."  *McCalister v. Hillsborough*

*County Sheriff*, 211 F. App'x 883, 884-85 (11th Cir. 2006).  "To set out a *prima facie* case, the plaintiff may show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class."  *Maynard v. Bd. of Regents of the Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

While Defendant does not dispute that Plaintiff is a member of a protected class (African American) or that he was subject to an adverse employment action (termination), Defendant does dispute that Plaintiff was replaced by someone outside the protected class or that similarly situated employees were treated more fairly.  First, Defendant argues that Plaintiff was not replaced by any specific individual.  Def.'s Br. (Doc. 34) at 16.  Indeed, Plaintiff concedes this point, stating that "[P]laintiff cannot point to any specific non-African[-]American replacement."  Pl.'s Br. (Doc. 39) at 7.  Second, Defendant states that "Plaintiff has failed to identify any similarly situated non-African-American employee who was treated more favorably," because "[a]side from Plaintiff, there were no other Senior Aircraft Processors who received similar criticism during his or her [ninety]-day probationary period and were not terminated."  Def.'s Br. (Doc. 34) at 16.  In an attempt to show comparators, Plaintiff claims that out of Plaintiff's AIDT graduating class, which consisted "mostly of Caucasians," Plaintiff was the only one assigned to clean the plant and the bathrooms.[3]  Pl.'s Br. (Doc. 39) at 7.  Plaintiff's

---

[3] The court notes that it is quite unclear whether Plaintiff was or was not assigned cleaning tasks beyond those included in the job description for Senior Aircraft Processors.  However, the court finds this fact to

10

argument is belayed by Plaintiff's own acknowledgment that the graduating class included both African-American and Caucasian employees, a list that is insufficient to establish comparators because it includes employees in the same protected class.

Additionally, Plaintiff attempts to dismiss his *prima facie* burden stating "where the [P]laintiff's position is not held open to be filled by someone else or plaintiff cannot come up with a specific comparator, [P]lantiff is not required to prove a McDonnell Douglas *prima facia* [sic] case." *Id.* at 6 (citing *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008)). The court finds no merit in this argument. In *Rioux*, the Eleventh Circuit held that when a plaintiff could not identify any similarly situated comparator who was treated more favorably, the *prima facie* burden may alternatively be met if a plaintiff can (1) establish that the plaintiff was replaced by someone outside his protected class and (2) provide evidence from which an inference of racial discrimination can be found. *Rioux*, 520 F.3d at 1276-77. Here, Plaintiff has not shown that he was replaced by a person outside his protected class. Neither has Plaintiff provided evidence from which an inference of racial discrimination can be found. Moreover, as Defendant points out, the fact-specific nature of *Rioux* is inapplicable to the present case because the court allowed Rioux this alternative standard because "it is not always possible for high-ranking employees to finds suitable comparators." *Id.* at 1277. Plaintiff was not a high-ranking employee at Sikorsky, but rather was a Senior Aircraft Processor who began working at Sikorsky alongside a class of forty-six other Senior Aircraft Processors.

---

be immaterial to the case, as Plaintiff's discrimination claim is based on his termination and Plaintiff's termination had nothing to do with whether or not he was assigned to clean.

Plaintiff has not and cannot show that he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. Thus, the court finds that Plaintiff has failed to establish a *prima facie* case of circumstantial evidence of wrongful termination. For this reason, Defendant is entitled to summary judgment as to Count I.

### 2. Providing a Legitimate, Nondiscriminatory Reason for Termination

Additionally, even if the court was to assume that Plaintiff could establish a *prima facie* case of termination on the basis of race, *which it does not*, Defendant would still be entitled to summary judgment as to Count I. Under *McDonnell Douglas*, if Plaintiff establishes a *prima facie* case, the burden then shifts to the employer to provide "legitimate, nondiscriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). Defendant's burden is "exceedingly light," and Defendant must merely proffer a non-discriminatory reason for the adverse employment action, not prove it. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

Here, Defendant provided multiple legitimate, nondiscriminatory reasons for the challenged employment action. Defendant asserts that Plaintiff's employment was terminated because Plaintiff performed poorly during his ninety-day probation period. Wood, who ultimately made the decision to terminate Plaintiff and was not aware that Plaintiff was an African-American, stated that he terminated Plaintiff based on multiple

12

complaints about Plaintiff's performance.  (Doc. 35) at 23; (Doc. 40) at 9.  Defendant offers the following specific complaints regarding Plaintiff's performance:  (1) Mechanic Jeff Soto suggested that Plaintiff should be terminated because Plaintiff lacked key skills, had difficulty performing his job, and had to obtain assistance from other employees to complete his tasks; (2) Supervisor Greg Kiel reported that Plaintiff did not complete an assigned task, and Plaintiff became argumentative when questioned about the situation; (3) Lead Employee Ray Horn alerted Defendant that Plaintiff's work needed to be watched over more carefully than the other employees in his area; (4) Lead Employee Eddie Ray Lewis, who is African American, expressed to management that "Plaintiff's skills were not up to par in comparison to other employees" and that Defendant should terminate Plaintiff's employment; (5) Sleasman reported that Plaintiff did not complete assigned tasks and stood around more than other employees; (6) Plaintiff received three bad evaluations, the third of which stated that Plaintiff's performance had declined since the date of the second evaluation; and (7) Plaintiff's poor performance damaged the aircraft.  Def.'s Br. (Doc. 34) at 16; (Doc. 35) at 20-24; (Doc. 40) at 6-7.

In addition, Defendant offers statistical evidence in support of the nondiscriminatory termination of Plaintiff's employment, stating "In 2007, there were [twenty nine] employees whose employment ended during the [ninety]-day probationary period.  Out of these [twenty nine] employees, [twenty three] were Caucasian and [six] were African American."  (Doc. 35) at 6 (internal citations omitted).  In light of the fact that Defendant's burden here is exceedingly light, the court finds sufficient legitimate, nondiscriminatory reasons for Plaintiff's termination.

### 3.     Proving the Reason to be a Pretext for Unlawful Discrimination

Once Defendant has proffered a nondiscriminatory reason for Plaintiff's termination, Plaintiff "then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).  In order to prove that a defendant's articulated reason is a pretext, a plaintiff must demonstrate not only that the reason is false, but also that intentional discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (emphasis in original)). To survive a motion for summary judgment, a plaintiff must rebut every legitimate, nondiscriminatory reason for the employment decision. *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Plaintiff denies poor performance, arguing that he believes he was a good employee and deserving of higher evaluations.  However, Plaintiff does not offer evidentiary support to challenge the poor evaluations.  In response to the complaints to management of Plaintiff's poor performance by many different employees, Plaintiff attempts to place these facts in dispute by arguing that, because no one ever complained directly to Plaintiff, these facts cannot be true.  However, again, Plaintiff does not point to any contradictory evidence in the record.  Additionally, Plaintiff asserts that he did not damage any aircraft, but again, Plaintiff offers no evidentiary support to create a genuine dispute of fact.

Next, Plaintiff attempts to establish pretext by arguing that "Defendant failed to follow policy and articulate its subjective reason" for terminating Plaintiff.  Pl.'s Br. (Doc. 39) at 11-15.  This argument appears to be two-fold.  First, Plaintiff asserts that the court can find pretext when an employer violates his own internal policy, and that Defendant's reasons for terminating Plaintiff should be deemed pretextual for failure to follow proper protocol with regards to Plaintiff's evaluations.  This argument does not hold.  If Plaintiff's argument is that the evaluations were not completed in a timely fashion, Plaintiff has failed to identify any violation of policy.  Defendant presented evidence, which Plaintiff did not refute, that although Defendant requires evaluations to be completed for all employees, "not all reviews end up being documented timely or even at all."  (Doc. 35) at 6.  If Plaintiff's argument is that the evaluations were not based on sufficient input from other supervisors, Plaintiff failed to offer evidentiary support for that assertion.  Plaintiff may not speculate that the supervisor did not collect input from others simply because Plaintiff has no knowledge that the supervisor did collect such input.

Second, Plaintiff argues that pretext can be inferred when an employee is terminated without notice of the grounds for the termination, and that this court should infer such pretext.  This argument also fails.  Plaintiff stated in his Complaint, and again at his deposition, that Defendant told Plaintiff he was being terminated because "[Plaintiff] had no initiative and [Plaintiff's] work quality was poor."  Compl. (Doc. 1) at 3; Pl.'s Depo. (Doc. 36-2) at 6.  Thus, the court declines to infer pretext on these grounds.

To the extent that Plaintiff attempts to establish pretext by arguing that "the credibility of Sleasman is brought into question," Pl.'s Br. (Doc. 39) at 15, the court is unconvinced.  It appears Plaintiff is accusing Sleasman of being mendacious[4] in stating that he received feedback from other supervisors regarding Plaintiff's performance prior to completing Plaintiff's eighty-day evaluation.   As support for the alleged untruthfulness, Plaintiff cites to one employee/supervisor, Dean Rainey, who stated he did not provide input to Sleasman.  The court finds this to be irrelevant; Defendant stated that Sleasman received input from Eddie Ray Lewis, Ray Horn, Jeff Soto, Greg Kiel, and Randall Hattaway.  Fluker Depo. (Doc. 36-3) at 54.  Thus, the fact that Mr. Rainey did not provide input establishes nothing.

To the extent that Plaintiff attempts to use the EEOC charge of discrimination as evidence of discrimination, the court notes that an EEOC charge is simply a prerequisite to bringing a federal discrimination case, not evidence of any discrimination. Plaintiff also states that "according to the index of [P]laintiff's deposition, there are between 60-70 references to race and racism."  Pl.'s Br. (Doc. 39) at 16.  The court is not surprised that the words race and racism would be used with such frequency at the deposition of a plaintiff alleging racial discrimination, but the court finds no legal relevance to this fact.

Not only does Plaintiff fail to establish that Defendant's reasons for the termination were pretextual, but Plaintiff's own testimony establishes that Defendants did not treat Plaintiff any differently based on his race.  Plaintiff agrees with Defendant that

---

[4] Plaintiff titled the heading of a section of his response "mendacity."  Pl.'s Br. (Doc. 39) at 15. The court notes that "mendacity" is defined as untruthfulness.

no one at Sikorsky has ever used any racially derogatory language or any racial epithet towards Plaintiff or any other employee. Pl.'s Depo. (Doc. 36-1) at 35. Additionally, Plaintiff admits that the reasons why the individual employees complained against him could have been based on non-racial reasons. At Plaintiff's deposition, when asked whether Defendant's employees discriminated against Plaintiff because of his race, Plaintiff stated "I said [they] discriminated against me. I didn't say anything to racism. It may have been my personality, the way I look. I don't know." *Id.* Again Defendant asked Plaintiff to provide the reason Plaintiff believes Sikorisky employees acted with racial bias, to which Plaintiff responded that employees "recognized who [Plaintiff] was, word got around who [Plaintiff] was in the community, a political activist, that they then started trying to find ways to get rid of me." *Id.* at 37. Plaintiff also admits in his deposition that he was, in fact, insubordinate when Kiel told Plaintiff to complete a task that Plaintiff did not complete. *Id.* at 41. Each of these facts support that Defendant did not terminate Plaintiff based on his race.

Plaintiff has failed to rebuff with any evidence the non-racial reasons for his termination as set forth by Defendant.[5] Because he has not met his burden, even were this court to assume a *prima facie* case of discrimination, Defendant is entitled to summary judgment as to Count I.

---

[5] In Plaintiff's Response to the Motion for Summary Judgment, Plaintiff includes sections titled "Cat's Paw Theory" and "Race Discrimination under Title VII." Pl.'s Br. (Doc. 39) at 16-17. The court notes that these sections simply recite legal theory and are devoid of any explanation or application to the case at hand. This does not satisfy Plaintiff's burden of showing pretext.

**B.    *Retaliation Claim (Count II)***

In Count II of the Complaint, Plaintiff claims "[D]efendant's actions toward [Plaintiff] violated his right to be free of retaliation discrimination in employment, in violation of Title VII."  Compl. (Doc. 1) at 6-7.  It appears from the Complaint that Plaintiff claims his termination was in retaliation for Plaintiff "respectfully ask[ing] his supervisor about the policy and practice of [Defendant] towards blacks in management positions."  *Id.* at 3.  Defendant moved for summary judgment on Count II,[6] arguing that Plaintiff's retaliation claim should be dismissed as a matter of law because (1) Plaintiff had not engaged in protected activity; (2) Plaintiff could not establish a causal connection between his inquiry regarding "blacks in management positions" and his termination; and (3) Defendant had legitimate non-retaliatory reasons for terminating Plaintiff.  Def.'s Br. (Doc. 34) at 19-21.

Plaintiff does not address this argument in his opposition to the Motion for Summary Judgment.  Therefore, he has abandoned this claim, and Defendant is entitled to summary judgment on Count II.  *See Clark v. City of Atlanta, Ga.*, 2013 WL 6037179, *5 (11th Cir. Nov. 15, 2013) (unreported) ("The district court, therefore, properly treated as abandoned the . . . claims, which were alleged in the complaint, but not addressed in opposition to the motion for summary judgment."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid summary judgment against him.");

---

[6] Defendant also appears to request summary judgment on any disparate treatment claims.  The court does not find any such claims to be present in the Complaint; however, even if the Complaint did include a

*Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1298 (M.D. Ala. 2012) ("[The non-moving party]'s failure to respond means that summary judgment is due to be granted in [the moving party]'s favor on [the claim to which no response was given]."); *Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1220 (M. D. Ala. 2012) ("[Ignoring a defendant's arguments] is unacceptable at the summary judgment stage, the point in the proceedings where it is incumbent upon the parties to research and defend their respective legal positions or else face an adverse ruling."); *Humphrey v. City of Headland*, 2012 WL 2568206, * 2 (M.D. Ala. July 2, 2012) ("Federal courts in this circuit, as well as in others, have found that a party's failure to respond to or to oppose arguments raised in a pending motion may result in abandonment of those issues.").

### C.    *ADA Claim (Count III)*

In Count III of the Complaint, Plaintiff claims that "Defendant failed to accommodate [P]laintiff's disability by wilfully and/or maliciously terminating [P]laintiff due to one or more of his long-term physical disabilities," in violation of the ADA. Compl. (Doc. 1) at 8-9.  At Plaintiff's deposition, Plaintiff and his counsel agreed with Defendant that the ADA claim was no longer a part of the case.  Pl.'s Depo. (Doc. 36-2) at 3-4.  Defendant now moves for summary judgment on Count III on the grounds that Plaintiff has abandoned that claim.  Def.'s Br. (Doc. 34) at 22.  Defendant informed the court in its statement of undisputed facts that "Plaintiff's claim under the [ADA] is no longer a part of [this] case," (Doc. 35) at 26, and Plaintiff did not challenge this assertion

---

disparate treatment claim, the court would grant summary judgment on that claim for the same reason stated here for Count II.

in his Response to Summary Judgment.  Pl.'s Br. (Doc. 39).  In fact, Plaintiff did not mention the ADA nor any of Plaintiff's alleged disabilities.

As with Count II, Plaintiff's failure to oppose Defendant's request for summary judgment on this claim results in this court finding that summary judgment is appropriate as to Count III.

**V.      CONCLUSION**

For the reasons stated in this opinion, it is

ORDERED that the Motion for Summary Judgment (Doc. 33) is GRANTED and this case is DISMISSED.

A separate judgment will issue.

Done this 4th day of March, 2014.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE